I apologize for the slight delay. I was on another assignment. Mr. Lurie. Good morning. May it please the Court. My name is Tom Lurie. I represent the Antwerp Corporation. This is an appeal from five consolidated re-examinations. The first of which was filed in 2005. The last one was filed in 2008. Antwerp, the patent that's at issue here is the 961 patent. It's been licensed by 20 companies, including three of the requesters in this case, and many of the world's largest tech companies. The issues on this appeal, there are two of them, anticipation and obviousness. Let me start out to just get the lay of the land here. Is it an oversimplification and or an overstatement to say that this claim is a claim on downloading? I think it is an oversimplification. It's a system of being able to distribute information wisely. Right, that's downloading. It is downloading in that sense. That's true. Downloading existed long before this. That would create a problem for us. What is it specifically about this claim that distinguishes it from the general phenomenon of downloading as we understand that? Well, the hard part is you have to put yourself back in time. Suppose this claim, forget the timing and so forth, does this claim essentially read on download? Would any form of downloading inference this claim? You're saying downloading as it exists today? Yeah. Would any form of downloading inference this claim? Frankly, I haven't really considered that and I don't know that it would. Oh, okay. I don't want to do it. Because when you put yourself back into the time frame and that's what you get with... I'd like to follow up there. Give me the point of novelty here. It's a combination of the elements. You've got central servers. Let me step back. There are really... I've read these briefs and... Yep. Help me out. The point of novelty at the time this invention was made was taking disparate kinds of information, audio, text, whatever, being able to store those in central servers and serve those widely over a telecommunications link to a plurality of subscribers. That's what we call subscriber stations. That's the basic concept that's at issue here. But what was new at the time was that idea. Jukeboxes is basically, in its simplest form, the preferred embodiment is like a jukebox. But Gopher did that. No. I would disagree. What did it not do in that recitation? It actually didn't do anything. It suggested it might be nice to try to do that, to try to do something like that. Well, that gets us right to one of the central issues. Isn't it presume-enabled? And our answer... Therefore, you're dismissing it as academic. Should itself perhaps be dismissed? Our answer to that is it should not be presume-enabled. There is no definitive ruling on that from this court. Amgen left the question open as to whether publications should be presume-enabled. In this case, in particular, these publications, the two that we're talking about, are before and the Minos publications. But they're not just outlines. These are scholarly, written recitations of what is happening, what can happen, etc. Why shouldn't references cited by the PTO be presumed to be enabled? They don't have testing facilities. And if you're arguing that they're not enabled, isn't it a burden on the applicant, the patentee in a re-examination, to show that they are not enabled? I think this is a re-examination. I think in this case the requester should have had that burden in the first instance because these are not publications where you can look at them and say, yeah, they built these, they're presumed to have worked. These are concepts that they say, well, it would be nice to have this, it would be great if we could do this, and maybe someday we will. That's the kind of publication these are. The requester should have had that burden. The next instance of where we are here is we're reviewing a decision by the board. Correct. Affirming a decision by the examiner. And so the question is, you're arguing non-enablement. Yes. So why shouldn't it be your burden? The reason is because the nature of these papers. Again, this is a request for examination. In addition, the patent office can cite other later references even that show enablement. They're not bound to have to go out and do research and declarations. They could have found, for example, a before paper published a couple years later and say, yeah, we actually did this. Remember, as Chief Judge Rader said, these are very bright people who wrote these papers. These are not the people of ordinary skill. These are people of extraordinary skill, and yet they did not make these systems. They said it would be nice to be able to make these systems, but as of today we can't make these systems. Frequently academics don't actually build the devices, but that doesn't mean they couldn't do it. Or that someone reading the paper couldn't do it. But should it be presumed that they can do it? That's the question. That's the question of who has the burden of proof. In this instance, for example, we submitted the declaration of Dr. Mercer, who goes into great detail as to why these are not enabling. I think that's important here, too. We did not just rely on the presumption that these are not enabling. We've also presented affirmative evidence that they're not enabling, and that declaration was filed in February of 2008. The last request was made in August of 2008, and yet the requester did not do anything to rebut Dr. Mercer's declaration, and they had an opportunity to do so. So it's not only up to the patent office under reexamination. It's certainly the requester's burden in the first instance to raise these issues. And the fact that they knew about Dr. Mercer's declaration and did not respond to it in the last request is another indication that there really isn't a response to Dr. Mercer's statement. Now, Dr. Mercer, his declaration is not just a conclusory statement. He goes into great detail about exactly why no one with an ordinary skill in the art at the time could have done the things that we say are the problems with these references. The patent office again and again said that there wouldn't have been undue experimentation in carrying out what's described. The question is, does that statement carry the patent office's burden once we've submitted Dr. Mercer's declaration? And if you go back to the SASA case, I don't know if that's the right pronunciation, S-A-S-S-E, which is the case that Amgen says is the precedent that it's relying on for its presumption. That case says that in the case when you have a patent, the patent office would cite the patent, and then there's presumption that the patent is enabled. Then the burden turns to the applicant to submit a declaration in response. In that case, SASA submitted its own declaration, and then the SASA court said that was sufficient. Then the burden was back on the patent office to do something beyond just rely on the patent itself. And in that case in SASA, what the court found was that the Board of Appeals had entered a new ground for rejection on appeal, and that satisfies the PTO's burden. Here, we don't have that. Here, the PTO has done nothing to respond to Dr. Mercer's declaration other than point back to the record. Other than make the finding that it was enabled. I mean, what would you have expected them to do beyond what they did? They received your evidence, and they said, no, actually, the WANs factors are met. Well, it's interesting. They don't really go through the WANs factors. All they say is, we reject Dr. Mercer's statement. But they give no basis for rejecting those statements. Other than we don't like them. We don't agree. And to say that the patent office can simply... What would you like them to do? We are not going to ask them to go out and run tests as of 1989, which, of course, they couldn't do. I mean, what do you want them to do? Find a rule in your paper. Yeah, you would like to see a rule in your paper. But I would like... I think they can go out and find additional references that show that this was enabled. That's the Bristol case. The Bristol case says the patent office has the right to go out and find additional references. But they've got four. Well, they have three, but they don't ever say that one shows... They don't ever say that one shows enablement of the other. Well... It's on the enablement point. They don't ever say one shows enablement of the other. And if you get to the specifics of what's not enabled, I think it's important to understand what the specifics of what's not enabled is. In the before paper, what's not enabled is the interface between the very high-speed BISDN system and the workstations. That's what's not enabled. And there's nothing in the record that shows that, at the time, anybody could have done that, that anybody could have taken this very extremely high-speed system... Well, because I think when you go through Dr. Mercer's declaration, you'll see they're not conclusive. Paragraph 11 discusses the topic I just mentioned, and it has several subparagraphs. That's on A450 through A451, basically. It has subparagraphs A through E that go into very great detail about why this is not enabled. It's not a conclusive. I turn the question back around. What more could the applicant do to show non-enablement? If Dr. Mercer's declaration is not enough, what would be enough? In a situation like this where you have very detailed, very specific reasons. More Dr. Mercer's. Isn't that what you said to them? They have to have more references, and in fact, they did. They had four. Did you have four Dr. Mercer's? But they didn't... I didn't have four Dr. Mercer's. I only needed one, I think. But they didn't combine the references to show non-enablement. The only combining they did was for obviousness, for other reasons. They didn't say, well, here's why this is enabled, because when I take the Minos reference and I combine it with the four, that's enablement. They never made that case. There's no way to show non-enablement of a reference. To carry it out and find it doesn't work, and I had to try this, and I had to go to undo experimentation. I had to try it six different ways in order to make it work. The concepts disclosed in the forum minutes are very complex systems. It would be virtually impossible to try to make one of those. This is why these should not be presumed to be enabled, because the highly complex distributed database systems that are disclosed in here are the kinds of things that would take millions of dollars to try to put together. And to say that Dr. Mercer had to spend that kind of money, I don't think that's the right standard. I think he did the right analysis. You would also argue that enablement is a question of law? Enablement is a question of law. Why is that so, one written description of the question of fact? Wow. Because this Court says it so, I guess. I think so. Would you like to say a little rebuttal? Yes. Thank you. GAFUR does reference BISDN. It was my recollection that GAFUR did not exclusively indicate that BISDN would be the mode of communication. That is true. But it did say that it needed ultra-high speed communication links for the data it was sending. It had to be around the order of 200 to 300 megabits a second. In compressed form. In compressed form. That's right. Compressed form had to be that fast. And the only thing that he identified as being capable of doing it at the time was BISDN. But it could be something else. But certainly not, there's no interface. The question is the interface of that to the workstations. That's the issue. Thank you, Mr. LaMarca. Please, the Court. Just to respond to a few points made by opposing counsel, Your Honors. First of all, the enablement question, with respect to the legal question, who has the burden? It's our view, as we pointed out in our brief, that the printed publication, whether it's a patent or a printed publication, that it ought to be treated the same when we cite a reference. What if my concern with a blanket rule that says a printed publication is presumed enabled is, what if it is really a cursory outline and it may recite each element of the claims but supplies no credible recitation of how that would be done? Well, the applicant in that case would always have the opportunity to say, look, you haven't sufficiently made a prima facie case, although you've pointed out the elements disclosed in your minimal disclosure. That's what he said here. Okay. But the first question is, we're not debating that if someone comes back and is able to rebut with evidence, lack of enablement, that that's the inquiry that would take place. The only question we're having here, the legal question initially, is who has to go first? The PTO has to go first to the extent that they have to go find a reference. They have to find a reference with all of the claim elements. They have to map those claim elements to the claim that are disclosed. And once they've done that, they've made a prima facie case of anticipation. Now, the applicant can come back and challenge that reference on a number of grounds. One of them could be, your reference is not adequate. There's not enough disclosure for enablement. Here's evidence. Another reason could be, oh, although on the surface there's a date, we don't think the here's some evidence. So there's a number of ways they could do it, but it's really just the applicant's ability to come back, challenge that prima facie case, and then that evidence gets considered. And you're right. At that point, the board and the examiner, they consider all that evidence and they make a determination on whether or not... In other words, you're saying there should be no difference between a patent as a reference, which is presumed valid and hence enabled, and a reference which, as the Chief Judge says, may be very sketchy. You're saying there shouldn't be a difference simply because the applicant is in a better position to show lack of validity. Yeah. For example, in the Amgen case, this court said both claimed and unclaimed disclosures are treated the same for purposes of when we have a reference asserted against a claim to prove it's anticipated. The point that they're making there, it's not about the presumption of validity. Presumption of validity is not where this comes from. Where it comes from is from when a reference is cited and we point out all of the features of the claim are disclosed on the surface, we've made our prima facie case, we've given adequate notice, now it's their opportunity to come back and attempt to rebut that with evidence. How high is the burden to show non-enablement? What would they have to do with that cursory outcome? I think it would be easier in that case. Your example, your hypo, is we've got this very minimal disclosure, maybe it's just a slide in the presentation is all it is, and yeah, the elements are there, but there's nothing else. That would be an example where it might be easier for the applicant to come back and say, you know, that's not enough, there's not enablement disclosed there, here's evidence as to why it's inadequate. They would have a better chance. What kind of evidence do you want there? Well, it depends on what the disclosure says, first of all. I understand that. But let's just say the disclosure says, put it in this context. Okay, here we put in just a list of these elements. Minimal things. High-speed network, centralized database with multimedia stored there, and distributed workstations. That's all it said, nothing else. They have to come back with evidence and say, look, you're before references from a certain date, and at that date, here's all the reference that shows no one had ever built a high-speed network. No one had ever had distributed workstations. No one had ever showed multimedia database in one place. That just hasn't happened. Now, you've talked about it, talked about it as it might exist as a great idea, but you haven't shown us how. That's not the case here. You know, that's not what our likely situation is to be, is that each one of those elements did exist, but one of them was over at IBM, and one was someplace else, and one was someplace else, and no one had put them together. How would you deal with that enablement problem? That would be tougher. I mean, that would be easier for them to rebut as well. Maybe all the elements are out there floating around, and you've just kind of put them together on a single page, but you haven't really integrated a full idea of how they would be linked together. In contrast, what VIFOR does is it's a very detailed explanation and analysis of how these things would fit together and how they do fit together. Now, it's true. It's a research paper. It's true. They didn't necessarily have a working model in place, but all of the things that they discuss in VIFOR, as well as Minos and Wong and Barrett, the four references, in all four references, not only do they discuss these elements, but they discuss these elements as they are already known, people are already using them, high-speed networks are important, compression and expansion of data is a critical way to get data from one spot to another over a limited pipeline, an electronic pipeline. All those things were known. In fact, their own specification, I think we pointed this out in our brief. For example, someone mentioned earlier, what about ISDN? And opposing counsel mentioned in their brief, well, ISDN is mentioned in those references, but they haven't actually used it. It was just a project is the way they spoke of it. Their own specification says an ISDN network was being built at the time of their application in France. It was being constructed, which means an ordinary artist in this field of high-speed networks knew how to make an ISDN network, knew how to transmit data over an ISDN line. So in our references, like before, and Minos mentioned it, there is significant evidence in the record that the board and the examiner relied upon to support their finding that it was enabled. Now, so we've got two questions. One is the legal question, who has to go first? Our view is a printed publication of a disclosure ought to be treated equally as a patent because unclaimed disclosures, whether they're in a patent or whether they're in a printed publication, they're both sufficient as your initial starting point. But once you get the starting point going, then they have to come back with evidence and once that evidence comes in, what's the PTO's burden at that point? They have to look at that evidence and they have to consider it and they have to weigh it against the evidence that they already have. They don't have to go out hunting for new evidence in some library. They've got all kinds of evidence right in this case and they've got that in front of And they weigh that against the rebutting evidence that comes in. And in this case, the board said, we don't think it's sufficient. And the reason we don't think it's sufficient, what you've come forth with, is because you haven't shown undue experimentation will be required. And the reason there's no undue experimentation is because these things, high-speed networks, ISDN, distributed workstations, a centralized database, they're out there. People, the ordinary artist knows how to make them. They have them in their possession. And what the ordinary artist already has in his head, that's part of the inquiry for enablement. So that's pretty much our case, Your Honor. The discussion today, and I think in the briefs as well on enablement, has been focused on Gafoor and Minos. I read Wong and with, I have to say, some perhaps limited comprehension of what Wong was saying, but it struck me that the defects, the possible defects in the abstract level of abstraction found in Minos and Gafoor, to the extent that they were academic forward-looking papers, didn't seem to be a problem so much with Wang. Do you understand Wang to be subject to the same enablement? It's our understanding that, based on the briefs, that enablement has not been challenged for the Wang reference. So, with respect to Wang, they are challenging that certain features aren't disclosed, which we've gone through in a brief, but they have not challenged enablement. Furthermore, with the Varick reference, which is part of all the obviousness projections, nobody's challenged enablement for any of those. So even if they were correct that the first reference before was inadequately enabled for anticipation, and even if they were correct for the second one, that Minos was inadequately enabled for anticipatory purposes, that doesn't get them to a patentable claim. They still have to deal with Wang, all anticipation rejections, they still have to deal with Varick in combination with these other references for obviousness. So, the point that we're making here is, that doesn't get them to the finish line, just getting past those first two. We don't think that they're correct, but I just wanted to point that out for you. You have another answer to the question I asked, or opposing counsel. Why enablement is a question of law, and isn't description fact? Well, our understanding is that it's a question of law based on underlying fact, which means it's both. There's a legal aspect to enablement, and underlying that are fact findings. And here, what are the facts? The facts are, we cited a reference pointing to the elements. They come back with factual evidence saying, wait a minute, it's not enablement. It's all procedural. But nevertheless, we're weighing facts in that context. But the overall conclusion, I think, is a legal one, similar to the way obviousness would be an overall legal conclusion based on underlying facts. Ultimately, undue experimentation is incredibly factual, isn't it? That's our view, Your Honor. If there's no further questions, I'll be happy to sit down. Thank you. Thank you, Your Honor. Thank you, Mr. Lamarca, and Mr. Lurie. One of the questions that came up was, what about if there's only minimal disclosure? And the concession was, well, if there's minimal disclosure, then it should be easy to rebut. Well, that's exactly what we have here with respect to GIFOR and MINIS. It's very minimal disclosure on the things that we say are not enabled. For example, in GIFOR, the thing we say is not enabled is the interface between this high-speed network and the workstation. And this is all GIFOR says about that. Furthermore, it should be able to be interfaced, it being the workstation, should be able to interface with the communication network and support communication protocols in order to That's all it says. That's not much of a disclosure. Would one skill in the art, even in 1989, know how to link a workstation to a central server? They would in certain circumstances, but not in the circumstances that GIFOR teaches. That's the enabling question. It's whether GIFOR enabled his invention, not whether GIFOR enabled something else. His invention is taking very high-speed, ultra-high-speed networks and marrying them to a workstation. And all he says is, well, you should be able to do that someday. And someday, yeah, they figure out how to do that, but certainly not then. And that's what Dr. Mercer talks about, is how complicated and hard it would have been to try to do that. And he doesn't do it conclusively. He talks about why it's hard to do that, why it would not be easy to do that. So it's more than just simply, I don't agree. So you have the exact situation here. But I think in this situation, where you have clearly forward-looking papers, as opposed to papers that talk about things that have already been done, those forward-looking papers should not be entitled to a presumption of enablement. Now, you do not, if I understand correctly, I asked your proposing counsel, with respect to Hwang, you do not challenge his enablement. That's correct. All right, and so the problem with Hwang is? The problem with Hwang is it does not disclose a telecommunications network. It uses only a LAN, local area network, which is not a telecommunications network. Well, that's the question, I guess. Why? If a LAN is a telecommunications question, telecommunications network, case open? I guess it would be, but I don't, if I can't answer that. Sure. Local area network is a local area network. It's called that because it's local. It's not distance. Telecommunication is over distances. In the materials that are attached to Dr. Mercer's declaration, which were in the record, he goes, including his declaration also, it explains the difference between telecommunications networks, which take information over long distances, and typically runs through the telephone system, historically, anyway. And a local area network, which could be made very high speed, but only very short distances. And so to say that a local area network is necessarily a telecommunications network ignores the reality of everybody's skill in the art. Thank you. Thank you very much. All rise.